J-S38011-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| STANLEY LEO SPRIGGS | : | |
| | : | |
| Appellant | : | No. 892 WDA 2017 |

Appeal from the Judgment of Sentence May 1, 2017
In the Court of Common Pleas of Cambria County Criminal Division at
No(s):  CP-11-CR-0001878-2015

BEFORE:   BOWES, J., NICHOLS, J., and STRASSBURGER*, J.

MEMORANDUM BY BOWES, J.:                    **FILED OCTOBER 22, 2018**

Stanley Leo Spriggs appeals from the judgment of sentence of life imprisonment without the possibility of parole imposed following his convictions for, *inter alia*, second-degree homicide.  We affirm.

On July 17, 2015, Appellant, along with Perry Henderson and Kenneth Simmons, came to Johnstown in order to purchase drugs.  Appellant, the driver, saw an acquaintance, Robert Hinton, at a Sheetz convenience store.  Appellant called to Hinton, who walked over to the vehicle.  Hinton testified that he recognized Appellant, whom he knew as Jamil, from six or seven years ago.  The two engaged in small talk, and Appellant eventually asked Hinton where he could buy heroin.  Hinton, who was a drug addict at the time, stated that he was uncomfortable with the request and pretended to send a text message.  However, Hinton's girlfriend, overhearing the conversation, said

_____
*   Retired Senior Judge assigned to the Superior Court.

that she could arrange the purchase. She texted Peebles, whom Hinton described as his occasional dealer.

The three defendants and Hinton, with Appellant driving, proceeded to the Solomon Homes complex where Peebles was waiting with three bricks of heroin. The negotiated price was $280 a brick. Hinton spoke to Peebles on the phone and arranged the sale, which took place inside a stairwell. Since Peebles did not know any of the three defendants, Hinton acted as an intermediary. Hinton asked who would be bringing the money for the deal, and Henderson and Simmons exited the vehicle. Appellant remained inside. Hinton felt that something was not right, as the three defendants refused to show Hinton that they had enough cash.

Hinton, Peebles, Henderson, and Simmons walked up the stairwell of one of the buildings. Hinton testified that shortly after Peebles showed the heroin, Hinton felt Simmons place a gun against the back of his head. He also saw Henderson holding a gun to Peebles' chest. Fearing for his life, Hinton ran up the steps. He heard a scuffle, followed by a gunshot. Video surveillance from inside the stairwell was played at trial, and shows Peebles, Simmons, and Henderson struggling. Firearms are visible, but the parties fall to the ground and the shooting is not visible. Simmons and Henderson fled, taking the heroin with them. Hinton came back down the steps shortly thereafter, and called 911.

Simmons accepted a plea to third-degree homicide in exchange for his testimony. He stated that all three men agreed to commit the robbery.

- 2 -

Appellant was convicted and sentenced as previously stated. Appellant filed timely post-sentence motions, which were granted in part with respect to vacating two of the sentences based on merger, and denied in all other respects. Appellant filed a notice of appeal, and complied with the order to file a Pa.R.A.P. 1925(b) statement. Appellant now raises fourteen issues for our review.

[1] Whether the trial court erred and abused its discretion by failing to suppress all evidence obtained and stemming from the vehicle stop by police, as the stop violated the Pennsylvania and United States' Constitutions?

[2] Whether the trial court erred and abused its discretion by failing to suppress DNA evidence obtained from the [Appellant], as there was no probable cause to believe the [Appellant]'s DNA would be found on any of the firearms found by police?

[3] Whether the trial court erred and abused its discretion by failing to suppress the photo lineup identification of the [Appellant]'s photo in the array presented was impermissibly suggestive? [*sic*]

[4] Whether the trial court erred and abused its discretion by failing to sever the [Appellant]'s trial from his co-defendant's, as the [Appellant] was prejudiced by the evidence presented against his co-defendant, and also through his co-defendant's unsophisticated self-representation, particularly but not limited to his cross[-]examination of Detective Wagner and Kenneth Simmons, at their joint trial?

[5] Whether the trial court erred and abused its discretion by improperly admitting into evidence inflammatory photographs of the crime scene which depicted large amounts of blood?

[6] Whether the trial court erred and abused its discretion by allowing Detective Lamantia to testify regarding his observations of a surveillance video that was never shown to the jury or

provided in discovery; thus, denying the [Appellant] his right to cross-examination?

[7] Whether the trial court erred and abused its discretion by permitting Detective Wagner to narrate/testify to his perceptions regarding surveillance video from inside Building 5, as Detective Wagner was not present during the depicted events and could not attest to its accuracy?

[8] Whether the trial court erred and abused its discretion by refusing to allow [Appellant] to play recordings of Kenneth Simmons's jail phone calls for use in and during his cross[-]examination of Mr. Simmons?

[9] Whether the trial court erred and abused its discretion by failing to grant [Appellant]'s Motion in Limine regarding Kenneth Simmons's testimony, after the Commonwealth failed to provide in discovery the first statement made to police by Mr. Simmons until four days before trial?

[10] Whether the trial court erred and abused its discretion by failing to grant a new trial based on the lack of a unanimous verdict, as one juror indicated the verdict was not unanimous regarding their vote on the offense of Third Degree Murder?

[11] Whether the trial court erred and abused its discretion by failing to grant a judgment of acquittal for the offenses of Robbery and Homicide/Second Degree Murder, as the [Appellant] was charged with Robbery as a principal, and there was no evidence to show the [Appellant] committed Robbery as a principal actor.

[12] Whether the trial court erred and abused its discretion by failing to modify the [Appellant]'s sentence because of the disparity between the co-defendant's sentences for Conspiracy to Commit Robbery, as the evidence showed his co-defendant Henderson was more culpable, yet the [Appellant] received a lengthier sentence?

[13] Whether the trial court erred and abused its discretion by failing to state adequate reasons for imposing lengthier sentences on [Appellant] than on his co-defendant, resulting in unreasonably excessive penalty for [Appellant]?

[14] Whether the trial court erred and abused its discretion by failing to consider the sentencing factors under 42 Pa.C.S.A. § 9721(b), resulting in aggravated range/statutory maximum sentences for all counts that did not mandate a life sentence, which were manifestly excessive?

Appellant's brief at 8-13.[1]

## II

## Challenges to pre-trial rulings

Appellant's first four issues concern the trial court's denial of claims raised in his pre-trial omnibus motion seeking to suppress evidence. We apply the following principles.

In reviewing the denial of a suppression motion, our role is to determine:

> whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the

---

[1] The trial court and the Commonwealth both invoked the oft-quoted wisdom of the late Honorable Ruggero Aldisert:

> With a decade and a half of federal appellate court experience behind me, I can say that even when we reverse a trial court it is rare that a brief successfully demonstrates that the trial court committed more than one or two reversible errors. I have said in open court that when I read an appellant's brief that contains ten or twelve points, a presumption arises that there is no merit to **any** of them ... [and] it is [this] presumption ... that reduces the effectiveness of appellate advocacy.

***Commonwealth v. Robinson***, 864 A.2d 460, 480, n.28 (Pa. 2004) (quoting Aldisert, "The Appellate Bar: Professional Competence and Professional Responsibility–A View From the Jaundiced Eye of the Appellate Judge," 11 Cap. U.L. Rev. 445, 458 (1982) (emphasis in original)). We agree with the criticism. Appellant presents fourteen issues, some of which are frivolous.

suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. Mackey*, 177 A.3d 221, 226 (Pa.Super. 2017) (quoting

*Commonwealth v. Jones*, 988 A.2d 649, 654 (Pa. 2010)).

**A**

Facts

Our scope of review is limited to the evidence presented at the suppression hearing. *In re L.J.*, 79 A.3d 1073, 1080 (Pa. 2013). We therefore set forth the facts adduced at the suppression hearing.

Officer Matthew Reihart of the City of Johnstown Police was dispatched to respond to Solomon Homes, and was the first officer on scene. He saw Peebles bleeding on the ground, unconscious and holding a firearm. Several bystanders were on scene trying to render aid. Officer Reihart spoke to Hinton, who supplied his name and stated that "he witnessed the incident and that three black males, two older black males and a younger black male fled in a four-door, green Sedan." N.T. Suppression, 7/28/16, at 8. Hinton

indicated that the vehicle was headed towards Altoona. Officer Reihart related this information to Sergeant Gerald Stofko, who arrived shortly after Officer Reihart. *Id*. at 9.

In turn, Sergeant Stofko testified that he spoke to an unidentified female, who stated the actors "had fled in a dark green vehicle and they were headed to the Altoona area." *Id*. at 17. He confirmed that Officer Reihart related the specific information from Hinton. *Id*. Sergeant Stofko then contacted dispatch, and told the operator "to have surrounding departments on the lookout for a dark green, four-door vehicle possibly with three black males." *Id*. at 18. The information was sent out by 911 dispatch at 2:25 a.m. *Id*. at 33. The vehicle was stopped at 2:31 a.m. by Officer Paul Mummert.

**B**

Seizure

Appellant challenges the constitutionality of the traffic stop and the evidence derived therefrom, which led to a search warrant and recovery of evidence. Clearly, Appellant's vehicle was seized by Officer Mummert.

> An officer may stop and briefly detain a person for investigatory purposes when that officer has "reasonable suspicion, based on specific and articulable facts, that criminal activity may be afoot." *Commonwealth v. Allen*, 555 Pa. 522, 725 A.2d 737, 740 (1999). "[T]he fundamental inquiry is an objective one, namely, whether the facts available to the officer at the moment of the intrusion warrant a man of reasonable caution in the belief that the action taken was appropriate." *Commonwealth v. Gray*, 784 A.2d 137, 142 (Pa.Super. 2001) (citation omitted). We must consider the totality of the circumstances, including such factors

as "tips, the reliability of the informants, time, location, and suspicious activity." **Id.** (citing **Commonwealth v. Freeman**, 563 Pa. 82, 757 A.2d 903, 908 (2000)).

**Mackey**, **supra** at 229.

We begin our analysis by quoting Appellant's argument in support of reversal.

> In the case at bar, Officer Stofko, one of the first officers to arrive on scene, testified at the preliminary hearing that "somebody" told us the actors left in a green four door Ford. This information was provided to dispatch to be put out over the radio. Later, at the motions hearing, Officer Stofko stated he spoke with an unnamed woman, who stated similar information, but a registration plate number, names/ages of the individuals, and the manner in which the vehicle left was not provided. Furthermore, Officer Stofko agreed he was not provided any indication the information was reliable, or even that the witness saw the alleged crime. Notably, the witness did not tell him what roadway the vehicle turned onto.
>
> Officer Reihart received similar information from a witness, but did not question the witness on his background, his possible involvement with the crime, or the witness's reliability.
>
> The stop of the vehicle, the Ford Escort Mr. Spriggs was driving, was unsupported by reasonable suspicion. Initially, Mr. Spriggs has a legitimate expectation of privacy in the vehicle, as he was the driver. The stop constituted an investigatory detention so it must be justified by specific and articulable facts giving rise to a suspicion of criminal activity. Officer Mummert, who performed the vehicle stop, did not testify to observing any indication of illegal activity himself. He simply received unverified information over the radio that 3 black males in a green four door sedan were involved in a shooting in Johnstown. This information was not enough to show specific and articulable facts to suspect my [*sic*] the individuals in car involved in criminal activity - they merely match a description of a potential car/suspect involved in a crime, a description given with no indication of where it came from or its reliability.

Appellant's brief at 26-28 (citations omitted).

It is unclear what the precise nature of Appellant's argument is. First, he appears to suggest that the pertinent consideration is limited to the facts that Officer Mummert[2] himself knew, as he emphasizes that the information received by him was "unverified." Relatedly, he states that Sergeant Stofko, who supplied the information to dispatch which was broadcasted to Officer Mummert, knew only that "somebody" told him the information. Thus, taken together, Appellant suggests that Officer Mummert's stop was based on unreliable information because he did not know its provenance.

However, Appellant's argument omits any mention of Officer Reihart's testimony, and it is quite clear that Officer Reihart was told by Hinton, who remained on scene, that the persons involved in the shooting were traveling a particular direction in a dark green vehicle. Appellant fails to recognize that it is well-settled that a police officer may validly rely on information related to a fellow officer in effectuating a seizure. We summarized that law in ***Commonwealth v. Chernosky***, 874 A.2d 123 (Pa.Super. 2005) (*en banc*).

> It is entirely permissible for an officer to engage in the investigation of a suspect based on the observations of another officer even when the officer conducting the investigation has not been supplied with the specific facts needed to support the seizure; however, the officer who made the observations must have the necessary facts to support the ordered interdiction. ***See United States v. Hensley***, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) (police may conduct investigatory stop in reliance on another police department's wanted flyer as long as flyer was issued based on articulable facts supporting reasonable suspicion); ***Commonwealth v. Kenney***, 449 Pa. 562, 297 A.2d

---

[2] Officer Mummert did not testify at the suppression hearing.

794 (1972) (officer making warrantless arrest pursuant to order from superior need not have probable cause for arrest provided superior had information necessary to support probable cause to order arrest). This precept flows from the realities of police investigation, which often relies upon the cooperation of many police officers.

*Id*. at 126.

*Hensley* was discussed by our Supreme Court in *Commonwealth v. Queen*, 639 A.2d 443 (Pa. 1994), which Appellant cites as supporting his argument. Therein, Officer Bryant of the Philadelphia Police Department proceeded to a scene following a police radio request. When he arrived, three detectives were standing behind a vehicle occupied by Queen. One of these detectives, Mr. Mango, approached Officer Bryant and stated that Queen "resembled a male wanted for robbery." *Id.* at 444. Based on this information, Officer Bryant seized Queen, which ultimately led to the recovery of a firearm. *Id.* At the suppression hearing, the Commonwealth called only Officer Bryant. Our High Court concluded that the Commonwealth was required to call Detective Mango to sustain its burden, relying in part on *Hensley*.

> The rationale of [*Whiteley v. Warden*, 401 U.S. 560 (1971)], and *Hensley* clearly supports the proposition that a stop and frisk may be supported by a police radio bulletin **only** if evidence is offered at the suppression hearing establishing the articulable facts which support the reasonable suspicion. . . .
>
> Applying the above principles to this record, it is clear that the suppression court erred in refusing to suppress [Queen]'s weapon. The suppression court assumed that Detective Mango possessed the required facts to conduct an investigatory stop. At the suppression hearing, Officer Bryant testified that Detective Mango

- 10 -

did not tell him any of the pertinent facts from which Detective Mango concluded that [Queen] was a suspected robber, only that Detective Mango believed he was. Therefore, the suppression court did not have a description of the robbery suspect or the circumstances surrounding the robbery. Without any such information, the suppression court was required to speculate as to whether Officer Bryant had sufficient facts to establish a reasonable suspicion.

*Id*. at 445–46 (emphasis in original).

Appellant's citation to **Queen** is misplaced, as the Commonwealth therein established nothing more than Detective Mango's belief that Queen was a robbery suspect. In effect, the Commonwealth asked the trial court in **Queen** to accept the fact that Detective Mango would not instruct a fellow officer to conduct an arrest in the absence of constitutionally adequate information, without proving what that information was. This case stands in stark contrast to **Queen**, as the Commonwealth called both Officer Reihart and Sergeant Stofko. Therefore, the relevant consideration is whether those men, who were the source of the pertinent knowledge, possessed reasonable suspicion. This inquiry is no different than asking whether Officer Reihart, based on his knowledge and information, would have been permitted to seize the vehicle.

We conclude that the answer is yes. Contrary to Appellant's argument that the information was unreliable, Officer Reihart spoke to Hinton, who identified himself and remained on scene. That fact alone is highly relevant. **See Commonwealth v. Hayward**, 756 A.2d 23, 34 (Pa.Super. 2000) ("[I]f an informer . . . identifies him or herself to the police, then there is an indicia

of reliability attached to the tip, because the informant has placed himself or herself at risk for prosecution for giving false information to the police if the tip is untrue."). This case is even stronger than an ordinary tipster case, as Officer Reihart was not merely acting on Hinton's assertion that a shooting had occurred. The officer saw the aftermath of that shooting, as he observed Peebles dying from a gunshot wound. There is no doubt that Officer Reihart was justified in concluding, under the totality of the circumstances, that criminal activity was afoot and that the persons in a dark green vehicle heading towards Altoona were possible suspects. Therefore, Officer Mummert, acting on his fellow officers' directions, was permitted to seize the vehicle that matched that description six minutes later for purposes of further investigation. No relief is due.

**C**

Search Warrant

Following the vehicular stop, firearms were recovered in the trunk. The Commonwealth executed a search warrant for Appellant's DNA in order to determine if it matched the DNA on the weapons. Appellant argues that there was no probable cause. We adopt the trial court's cogent analysis of this issue as our own.

> [A] totality of the circumstances test is utilized to evaluate whether probable cause exists for the issuance of a search warrant. *See Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); adopted by the Pennsylvania Supreme Court in *Commonwealth v. Gray*, 509 Pa. 476, 484, 503 A.2d 921, 925 (1985); *Commonwealth v. Jones*, 542 pa. 418, 424,

668 A.2d 114, 116 (1995). "The information offered to demonstrate probable cause to search must be viewed in a common sense, nontechnical, ungrudging and positive manner." *Commonwealth v. Woods*, 590 A.2d 1311, 1313 (Pa. Super. 1991). "It is based on a finding of probability, not a *prima facie* showing of criminal activity." *Id*. "[Reviewing courts] must test and interpret the affidavit in a realistic fashion, and the resolution of doubtful or marginal cases should be largely determined by the preference to be accorded to warrants." *Commonwealth v. Nycz*, 418 A.2d 418, 422 (Pa. Super. 1980).

In the instant matter, [Appellant] was driving the subject vehicle at the time of the traffic stop. Additionally, the Commonwealth presented evidence that he drove the vehicle earlier in the day. The guns were found in the trunk of the vehicle. As the Commonwealth emphasizes, the driver of a car clearly has dominion over the contents of the trunk. [Appellant] relies heavily on the fact that he remained in the vehicle and was never seen handling a weapon. However, because the guns were ultimately located in the trunk of the vehicle, we find there was sufficient probable cause to couple ownership or possession of the guns with the driver of the vehicle. [Appellant]'s motion is without merit.

Suppression Court Opinion, 8/30/16, at 13-14.

**D**

Photo Array

Appellant's fourth claim challenges the denial of his motion to suppress Hinton's identification, on the basis that the photo array containing Appellant's picture was unduly suggestive. Appellant maintains that his picture stood out more than the others, as his photo

was emphasized more than the other photos used in the lineup. See Exhibit 4, N.T. 7/26/16. In said photo, his lips, appear to be much lighter than the other suspects' photos. *Id*. Also, his beard appears to be white, much more so than any other persons depicted in the other photos.

- 13 -

Appellant's brief at 32-33. We recently set forth the principles applicable to such challenges.

> In deciding whether to admit contested identification evidence, the trial court must consider: (1) the opportunity of the witness to view the perpetrator at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of his prior description of the perpetrator at the confrontation; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and confrontation. ***Commonwealth v. Moye***, 836 A.2d 973, 976 (Pa. Super. 2003). "Suggestiveness in the identification process is but one factor to be considered in determining the admissibility of such evidence and will not warrant exclusion absent other factors."
>
> The suppression court may suppress an out-of-court identification only where, after considering all the relevant circumstances, "the facts demonstrate that the identification procedure was **so impermissibly suggestive** as to give rise to a very substantial likelihood of irreparable misidentification." ***Commonwealth v. Kendricks***, 30 A.3d 499, 504 (Pa. Super. 2011) (citation omitted and emphasis added). The most important factor in addressing the reliability of an identification is the witness's opportunity to observe the perpetrator at the time of the crime. ***Commonwealth v. Edwards***, 762 A.2d 382, 391 (Pa. Super. 2000).

***Commonwealth v. Milburn***, 2018 WL 3078669 at *5-6 (some citations omitted, emphasis in original).

The court set forth the following with respect to its ruling that the photo array was not suggestive.

> [Appellant] alleges that his photograph is highlighted white in comparison to the other five pictures. The Commonwealth agrees that while this is true of the photocopied line-up that was provided to [Appellant] in discovery, it is not true of the original array showed to Hinton on the night in question.
>
> We agree with the Commonwealth that while the quality of the photocopies may be poor, the original line-up does not place any

- 14 -

emphasis upon [Appellant]'s photo. Moreover, consistent with case law, the suggestiveness of a photo array is dependent on the ability of the witness to view the defendant. In the instant matter, Hinton clearly testified that he knew [Appellant], albeit as Jamil, that they met when Hinton was 18 years old, that they used to "hang out," and that he would consider [Appellant] a friend. Given this familiarity, Hinton clearly recognized [Appellant], and identified him as such. Thus, the photo array was superfluous. [Appellant]'s Suppression Motion must fail in this regard.

Suppression Court Opinion, 8/30/16, at 9-10.

We fully agree with the court's analysis of the array. Even a cursory glance at that exhibit establishes that the array is not suggestive. Indeed, our independent review of the array required an examination of the suppression hearing transcript to determine which of the pictures depicted Appellant, as none of the pictures stands out more than any other.

Additionally, even if the array were unduly suggestive—and it plainly is not—Appellant is not entitled to relief because Hinton had an independent basis for the identification. Appellant initiated contact with Hinton due to their prior relationship, and, as Hinton testified, he immediately recognized him. As our Supreme Court observed in **Commonwealth v. Smalls**, 741 A.2d 666 (Pa. 1999), a prior relationship is an independent basis justifying the in-court identification. "Since the witnesses were acquainted with appellant prior to the commission of the crime, there is an independent corroboration that the in-court identification was not tainted." **Id**. at 679 (footnote omitted).

Finally, we note that Appellant never denied that he was present. In his pre-trial motion to sever, Appellant set forth the following:

> [Appellant] avers his case is presently joined with his two co-defendants for trial. [Appellant] avers the Commonwealth's evidence does not allege that [Appellant] took part in the actual shooting, nor does it allege he was present in the actual building in which the shooting took place. [Appellant] avers that the jury will use evidence of his co-defendants' participation in the shooting to infer guilt on his part. The [Appellant] avers the jury will be incapable of separating the evidence produced against him and the evidence produced against his co-defendants. The [Appellant] avers that he will be prejudiced by a joint trial because of the aforementioned reasons.

Omnibus pre-trial motion, 1/26/16, at unnumbered 7-8 (paragraph breaks omitted).

Appellant did not claim that his defense was incompatible with that of his co-defendants, *e.g.* that he was not present at the scene of the crime. His defense was that he remained in the car while the other men completed the drug deal, and did not know of any plan to rob Peebles. In fact, his closing argument conceded that he was probably guilty of arranging a drug deal. "I would submit to you that the evidence showed that the only criminal mind that Stanley had was for a conspiracy to possess drugs or that he aided in setting up the drug transaction. And if they had charged Stanley with a drug crime, I would probably tell you to find him guilty of that." N.T., 2/21/17, at 7.

It is baffling to this Court that Appellant can now claim that he was misidentified and that he is entitled to a new trial when (1) not one photograph stands out more than the others in the array; (2) Appellant and Hinton were friends, thereby providing an independent basis for identification, and (3)

- 16 -

Appellant does not deny that he was present. This claim is not only meritless, it is frivolous. We remind counsel that an appellate brief is not an exercise in issue spotting, and direct his attention to the observations in footnote one, *supra*, regarding effective appellate advocacy.

**E**

Motion to sever

As noted, Appellant filed a motion to sever his case from his co-defendants. According to criminal procedural rules, a court may order separate trials "if it appears that any party may be prejudiced by offenses or defendants being tried together." Pa.R.Crim.P. 583. "The decision whether to sever the trials of co-defendants resides within the sound discretion of the trial court and will not be disturbed on appeal absent a manifest abuse of such discretion." ***Commonwealth v. King***, 721 A.2d 763, 771 (Pa. 1998) (citation omitted).

As quoted *supra*, Appellant moved to sever because the Commonwealth did not allege that he directly participated in the robbery and murder. On appeal, Appellant continues that same argument. However, he adds that the trial court failed to sever due to the fact that his co-defendant, Henderson, represented himself *pro se*. He alleges that Henderson made numerous mistakes and asked open-ended questions which permitted witnesses to reiterate main points. "Mr. Henderson's *pro se* defense was an utter failure,

and doomed from the start, and [Appellant] should not have been subjected to Mr. Henderson's shortcomings." Appellant's brief at 38-39.

With respect to Henderson's self-representation, we discern no error. That issue was not presented to the trial court as a basis to sever, and the trial court has no authority to *sua sponte* interfere with the presentation of trial. We therefore decline to consider that aspect of Appellant's argument.

What remains is Appellant's claim that severance was warranted due to potential confusion. Appellant states:

> However, if at any point, any member of the jury confused which defendants were alleged to have entered the building at Solomon Homes with the witness R[ichard] H[inton], the prejudice to [Appellant] is immense, simply because the potential culpability for the actors alleged to have been in the building during the shooting is much greater. There was no evidence showing [Appellant] knew what actions Defendant Henderson and Defendant Simmons were going to take inside the Solomon Homes building. The risk that the jury will simply use evidence of the Defendant Simmons and Defendant Henderson's alleged participation in the shooting against [Appellant] was too great for the consolidated trial to have been fair to [Appellant].

Appellant's brief at 36-37.

This argument not only attributes a remarkable degree of incompetence to our juries, it ignores the applicable law. Regarding the possibility that the jury may have been confused as to whether Appellant was actually in the building for the murder, there was absolutely no confusion on this point, as all

parties agreed that Appellant remained in the vehicle during the robbery.[3]

Unsurprisingly, Appellant fails to cite to any place in the record that could possibly lead the jury to conclude otherwise.

Next, Appellant's argument that "There was no evidence showing [Appellant] knew what actions Defendant Henderson and Defendant Simmons were going to take inside the Solomon Homes building," militates in **favor** of a joint trial, as our judicial system prefers a single determination of disputed facts. We stated in **Commonwealth v. Cole**, 167 A.3d 49, 57 (Pa.Super. 2017), that "there is a universal preference for a joint trial of co-conspirators."

> As our Supreme Court explained in **Commonwealth v. Housman**, 604 Pa. 596, 986 A.2d 822, 834 (2009), joint trials are preferred where conspiracy is charged. Nevertheless, severance may be proper where a party can establish the co-defendants' defenses are so antagonistic that a joint trial would result in prejudice. However, the party seeking severance must present more than a mere assertion of antagonism.

**Id**. (cleaned up).

Herein, Appellant and Henderson were charged as conspirators, and therefore joint trials were favored from the outset. This principle even extends to cases where there is a dispute as to who did what. "In fact, it has been asserted that the fact that defendants have conflicting versions of what took place, or the extents to which they participated in it, is a reason for rather

---

[3] For example, the Commonwealth stated in closing argument: "And this part of the conspiracy, also testified by Mr. Simmons, Mr. Spriggs decides that he doesn't want to get out of the vehicle. He sends Mr. Simmons and Mr. Henderson to go or further the conspiracy." N.T., 2/21/17, at 46.

than against a joint trial because the truth may be more easily determined if all are tried together." ***Commonwealth v. Chester***, 587 A.2d 1367, 1373 (Pa. 1991). In this case, Appellant and Henderson's defenses were not conflicting, since both men maintained that there was no conspiracy to rob Peebles. Appellant's defense was that he remained in the vehicle while the planned drug deal occurred, and Henderson asserted that he shot Peebles in self-defense after the deal went wrong. Taken together, the trial court would have committed an abuse of discretion in **granting** the motion to sever. While Appellant deserves credit for crafting an argument that manages to defy both logic and law, he does not deserve relief.

## III

## Evidentiary rulings

The following claims address the trial court's decision to admit various pieces of evidence.

## A

Photographs

Appellant alleges that the trial court abused its discretion in admitting three particular photographs, which he states are inflammatory. We apply the following test.

> The trial court must apply a two-part test prior to admitting photographs into evidence over objection by a party. First, the court must determine whether the photograph is inflammatory. ***Commonwealth v. Eichinger,*** 591 Pa. 1, 915 A.2d 1122 (2007). This Court has interpreted inflammatory to mean the photo is so gruesome it would tend to cloud the jury's objective assessment

of the guilt or innocence of the defendant. *Commonwealth v. Dotter,* 403 Pa.Super. 507, 589 A.2d 726 (1991). Next, if the trial court decides the photo is inflammatory, in order to permit the jury to view the photo as evidence, it must then determine whether it is has essential evidentiary value. *Eichinger,* 915 A.2d at 1142 (Pa.2007).

*Commonwealth v. Funk*, 29 A.3d 28, 33 (Pa.Super. 2011).

We have reviewed the photographs at issue and agree with the trial court's analysis that the photographs, which depict a blood-soaked towel and blood near where Peebles was discovered, were not inflammatory. The photographs, while unpleasant, do not display the victim's body, and, as the Commonwealth notes, Appellant has failed to cite a case holding that a depiction of blood **alone** was inflammatory. In fact, our precedents suggest the opposite. *See Commonwealth v. Spell*, 28 A.3d 1274, 1279 (Pa.Super. 2011) ("While [Spell] claims the presence of blood in these color photographs is inflammatory, that result is not made out by the mere depiction of blood."). "Murder evidence is not often agreeable, but sanguinity does not equal inadmissibility." *Id*. We agree that the photographs were not inflammatory, and the court therefore did not abuse its discretion.

**B**

Testimony regarding surveillance video not recovered

Appellant next argues that his constitutional right to confront witnesses was violated during Detective Gregory Lamantia's testimony, in which he testified regarding observations he made from reviewing footage from exterior cameras at Solomon Homes. Detective Lamantia recorded what he saw, but

- 21 -

the videos were never copied and thus not provided in discovery. The testimony established that a car was on scene at 2:04 a.m., and left the parking lot shortly thereafter. Detective Lamantia observed three individuals walking from the car towards a building. Appellant maintains that he is entitled to a new trial. Appellant's brief at 44 ("[T]he trial court ruling impaired [Appellant]'s constitutional right to confront witnesses against him, and his conviction should be overturned on this basis.").

We agree with the Commonwealth that Appellant's real complaint is not that he could not confront Detective Lamantia—he plainly could—but rather that he could not "cross-examine" the video itself.[4] In **Delaware v. Fensterer**, 474 U.S. 15 (1985) (*per curiam*), the United States Supreme Court addressed a Confrontation Clause claim concerning an expert witness's inability to recall precisely how he determined that a hair was forcibly removed. The Court stated:

> Agent Robillard's inability to recall on the stand the basis for his opinion presents none of the perils from which the Confrontation Clause protects defendants in criminal proceedings. The Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. To the contrary, the Confrontation Clause is generally satisfied when the defense

---

[4] As the Commonwealth notes, Appellant did not object on alternative grounds, such as the best evidence rule. As the United States Supreme Court has stated: "[I]f a statement is not made for the primary purpose of creating an out-of-court substitute for trial testimony, its admissibility is the concern of state and federal rules of evidence, not the Confrontation Clause." **Williams v. Illinois**, 567 U.S. 50, 83–84 (2012) (plurality) (cleaned up).

is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony.

*Id*. at 21–22.

We therefore find that Appellant's Confrontation Clause argument does not warrant relief.

**C**

<u>Narrative testimony</u>

Appellant's next claim also concerns a surveillance video. The Commonwealth introduced video from the entryway of the building where the murder occurred. Over Appellant's objection, Detective Lawrence Wagner narrated the video, explaining that the viewer would see Hinton and Peebles entering the building through the exterior door and proceed up a stairwell outside the camera's view. Henderson and Simmons follow. Detective Wagner stated the video then shows Henderson, holding a handgun, already struggling with Peebles as the parties come back in view. Simmons, also with a handgun, is seen leaning over to pick up something, which Detective Wagner opined was the heroin that Peebles intended to sell. Appellant complains that this narration impermissibly influenced the jury to accept Detective Wagner's testimony of what the video actually depicted.

We recently examined a similar claim in ***Commonwealth v. Palmer***, 2018 WL 3121452 (Pa.Super. June 26, 2018), wherein the prosecution played several surveillance videos which the investigators determined showed Palmer

in the area of the crime scene.  The detective narrated the videos, explaining to the jury how and why he identified Palmer based on his review of the video and other evidence.  We observed:

> Detective Wearing merely testified that he identified the shooter by finding and watching the video surveillance of the shooting, then examining earlier portions of the video for other instances where the suspect appeared. . . . Thus, Detective Wearing's testimony about the videos was based upon his perception of them, placed his subsequent actions in context, and was helpful in allowing the jury to reach a clear understanding of all his testimony.  Hence, his fact testimony permissibly included non-expert opinions and was properly admitted.
>
> Furthermore, we note that the videos had little relevance if Appellant was not the person appearing at the times highlighted by the Commonwealth. The jury was obviously aware that the Commonwealth believed that the person was Appellant, and it was the jury's duty to determine if the Commonwealth proved that fact beyond a reasonable doubt. The jury itself watched the videos, and was free to reach a different conclusion if it disagreed with Detective Wearing's conclusion that it was Appellant depicted on the video at specific moments in the footage. We therefore find no abuse of discretion.

*Id*. at *13.

The same logic applies herein.  Detective Wagner explained his perception of the video, which placed the events and investigation in context. Additionally, the trial court instructed the jury both before and after the challenged testimony that their perceptions controlled, and that they were free to accept or reject the testimony.  "[The Commonwealth is] asking Detective Wagner to narrate [the video], what he sees, his perception of what he sees on the video.  You are not to be guided by Detective Wagner's narration.  You're to be guided by what you see and what conclusions you

draw from the narration." N.T., 2/15/17, at 136. Following the narration, the trial judge reminded the jury of the instruction. "You're to be guided by what you observed on the video. If that concurs with Detective Wagner, that's fine. If it doesn't, then, as in all questions of fact, you're to determine the facts of what you saw." *Id*. at 139. We find no abuse of discretion.

**D**

Recessing the jury at approximately 5:00 p.m. during cross-examination

Appellant's next claim is that the trial court erred by not permitting him to cross-examine Simmons with the contents of a recorded phone call made from jail. We find no abuse of discretion.

During cross-examination, Appellant asked if, paraphrased, Simmons told his mother that he would implicate Appellant as an active participant in the robbery in order to curry favor with the prosecution. Appellant asked for a sidebar, where he informed the judge he had subpoenaed jail call records and intended to play a tape of one of the calls. The Commonwealth objected on authentication grounds, and stated that the proper course was to introduce this evidence during Appellant's case-in-chief. The judge stated that the matter would take some time to resolve, and decided to dismiss the jury for the weekend. The transcript states that the jury was in recess at 4:55 p.m. On Monday, cross-examination resumed without restriction.

"The trial judges of this Commonwealth exercise broad powers while presiding at the trial of cases assigned to them." ***Commonwealth v.***

*Pittman*, 466 A.2d 1370, 1373 (Pa.Super. 1983) (citation omitted). The decision to recess for the day clearly falls under those broad powers. Remarkably, Appellant nonetheless asserts that this single act warrants a new trial. "[T]he trial court erred by not permitting Appellant to play the recordings during his initial cross-examination on February 17, 2017. Thus, his convictions should be overturned and the case remanded for retrial." Appellant's brief at 50. To quote this argument is to defeat it. As the Commonwealth notes, this speculation could easily go the other direction. Had the judge kept the jury in the box for the evening, Appellant could complain that the jury was tired and inattentive due to the upcoming weekend. We find no abuse of discretion.

**E**

Remedy for discovery violation

On February 14, 2017, the first day of trial, Appellant filed a motion in *limine* seeking to bar Kenneth Simmons's testimony. Within the motion, Appellant alleged that the Commonwealth had provided in discovery two statements given by Simmons, but failed to disclose his initial recorded statement to the police, which was given on the night of the crime. Appellant realized that statement existed due to another police report referring to its existence. Appellant requested the statement on February 6, 2017, and the Commonwealth supplied the recording on February 10, 2017, four days before trial.

There was no hearing on this matter as the trial court summarily denied the motion before trial started. The Commonwealth, however, does not dispute the facts, and, since the motion itself states that the Commonwealth turned the material over upon request, we accept the allegations for purposes of our review. The trial court is authorized to impose sanctions for discovery violations.

> **(E) Remedy.** If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit discovery or inspection, may grant a continuance, or may prohibit such party from introducing evidence not disclosed, other than testimony of the defendant, **or it may enter such other order as it deems just under the circumstances**.

Pa.R.Crim.P. 573 (emphasis added).

Appellant claims that the only order "just under the circumstances" was preclusion of Simmons's testimony. We disagree. As the Commonwealth notes, cases have reversed orders that barred the Commonwealth from introducing evidence, finding that the sanction was too harsh. ***See Commonwealth v. Robinson***, 122 A.3d 367 (Pa.Super. 2015) (precluding Commonwealth from calling the victims as witnesses, based on noncompliance with order requiring transcription of statements, was an abuse of discretion).

Appellant fails to explain why the trial court was obligated to bar the testimony. His motion asserted that he was prejudiced by the late disclosure because he was unable to investigate, but does not develop that claim beyond that mere assertion. Moreover, Appellant's motion states that he was aware

of the missing information a full week before jury selection. Once Appellant discovered the error he could have, *inter alia*, requested a postponement if more time for investigation was truly needed. While the Commonwealth was obviously required to disclose the material in the first place, Appellant's requested sanction was much too harsh, especially in light of alternative remedies and where there was no suggestion that the omission was deliberate. No relief is due.

## IV

## Challenges to the verdict

## A

<u>Unanimity of verdict</u>

Following the jury's verdict as read by the foreperson, Appellant requested polling. Juror number one indicated a verdict of guilty for third-degree homicide, while the foreperson stated that the jury's verdict for that charge was not guilty. Consistent with the foreperson's declaration, juror number one indicated a verdict of guilty as to second-degree homicide.

Appellant raised this issue in his concise statement, and we adopt the trial court's thoughtful resolution of this claim.

> The record is clear that the foreperson initially indicated a verdict of not guilty as to Count 1, Criminal Homicide, Third Degree Murder. N.T. 2/21/17 at p. 108. Thereafter, counsel for Co[-] Defendant Henderson requested an individual poll of the jury. N.T. 2/21/17 at p. 110. Juror Number One twice indicated a verdict of guilty as to Count 1, Criminal Homicide, Third Degree Murder relative to Defendant [Appellant]. ***Id***. At the completion of Juror Number One's individual poll, defense counsel for

Defendant [Appellant] requested to approach the bench, and the following exchange occurred:

ATTORNEY DOMBROSKY: I don't know if I caught that?

THE COURT: Sorry?

ATTORNEY DOMBROSKY: I don't know if I caught that, I believe she said not guilty for a second and third degree murder.

THE COURT: That's what I heard too. Did you hear that?

ATTORNEY BEYER: I did as well, Your Honor.

N.T. 2/21/17 at p.p. 111-112.

Following this discourse, we decided to continue polling the other jurors, especially given that Second Degree Murder is a higher degree of crime. N.T. 2/21/17 at p. 112. All other jurors responded consistently with the verdict as to both defendant and Co[-]Defendant Henderson. N.T. 2/21/17 at p.p. 113-137. Thereafter, we called counsel to sidebar, and defense counsel voiced a request to re-poll Juror Number One. N.T. 2/21/17 at p. 137. During the re-poll, Juror Number One indicated a guilty verdict as to Count 1, Criminal Homicide, Second Degree Murder, and a not guilty verdict as to Count 1, Criminal Homicide, Third Degree Murder. N.T. 2/21/17 at p.p. 137-138.

Firstly, the record confirms that despite what counsel, and the Court, may have heard, Juror Number One consistently answered that defendant was guilty as to Count 1, Criminal Homicide, Second Degree Murder. N.T. 2/21/17 at p.p. 110 and 137-138. Because Juror Number One modified her initial answer from guilty to not guilty as to Third Degree Murder during the re-poll, we believe that defense counsel is incorrect in his assertion that the verdict was not unanimous. Additionally, during the individual poll of the remaining eleven jurors, we had the opportunity to observe the demeanor of Juror Number One. Given her body language after hearing the other jurors' responses, we believe that she realized her error, and appeared visibly shook up and embarrassed. Any error was cured by the re-poll, which was done

- 29 -

at defense counsel's request.  Thus, we believe that defendant's allegation of a non–unanimous verdict lacks merit.

Trial Court Opinion, 7/5/17 at 13-15.

**B**

Sufficiency of the evidence

Appellant challenges the sufficiency of the evidence supporting the offenses of robbery and second-degree murder.  Appellant claims that the Commonwealth charged him as a principal, and, there being no evidence to support that fact, he is entitled to discharge at both robbery and second-degree murder.

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt.  In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder.  In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence.  Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.  The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.  Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered.  Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Hewlett*, 189 A.3d 1004, 1008 (Pa.Super. 2018)

(quoting *Commonwealth v. Caban*, 60 A.3d 120, 132-33 (Pa.Super. 2012)).

This claim is meritless. In **Commonwealth v. Murphy**, 844 A.2d 1228 (Pa. 2004), our Supreme Court examined accomplice liability as a component of the sufficiency of the evidence test.

> In determining whether the evidence was sufficient to support a defendant's conviction, we must review the evidence admitted during the trial along with any reasonable inferences that may be drawn from that evidence in the light most favorable to the Commonwealth as the verdict winner. If we find, based on that review, that the jury could have found every element of the crime beyond a reasonable doubt, we must sustain the defendant's conviction.
>
> . . . .
>
> It is well-established, however, that a defendant, who was not a principal actor in committing the crime, may nevertheless be liable for the crime if he was an accomplice of a principal actor.

*Id*. at 1233-34 (citations and footnotes omitted).

Appellant does not claim that the evidence presented at trial does not warrant a finding of accomplice liability. Instead, he asserts that the evidence was insufficient by way of challenging the criminal information.

> Instantly, the Commonwealth charged [Appellant] as a principle [*sic*] in the commission of the crime of robbery: "Count 3: Robbery 18 Pa.C.S.A.3701(a)(1)(i) - Felony 1st Degree. The Actor, in the course of committing a theft, inflicted serious bodily injury upon Thomas Peebles by shooting him." **See** Information. Notably, the Commonwealth also charged him with Criminal Homicide and Aggravated Assault, "as a principal or accomplice."
>
> However, the sum of the evidence showed that [Appellant] did not participate as a principal in the robbery.

Appellant's brief at 60.

Appellant recognizes that this claim goes to the sufficiency of the evidence. Thus, we fail to see why any defect in the criminal information[5] is relevant to whether the jury was presented with sufficient evidence to sustain a finding of accomplice liability. Since Appellant's argument is limited to an argument that he was not guilty as a principal, this claim fails.

**V**

**Sentencing claims**

Appellant's remaining three claims all challenge his sentence. He alleges (1) that the court erred by imposing a greater sentence than that of his co-defendant Henderson, whom Appellant maintains was more culpable; (2) the court failed to state adequate reasons for its sentence; and (3) the court imposed a manifestly excessive sentence. These claims challenge the discretionary aspects of his sentence. The following principles apply.

> An appellant is not entitled to the review of challenges to the discretionary aspects of a sentence as of right. Rather, an appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction. We determine whether the appellant has invoked our jurisdiction by considering the following four factors:
>
> (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.[ ] § 9781(b).

---

[5] Appellant does not cite any case holding that the Commonwealth is required to specify, in the criminal information, the precise theory of culpability.

***Commonwealth v. Samuel***, 102 A.3d 1001, 1006-07 (Pa.Super. 2014) (some citations omitted).

"A defendant presents a substantial question when he sets forth a plausible argument that the sentence violates a provision of the sentencing code or is contrary to the fundamental norms of the sentencing process." ***Commonwealth v. Dodge***, 77 A.3d 1263, 1268 (Pa.Super. 2013) (quotation marks and citation omitted). We find that Appellant has failed to meet this test, as a mandatory sentence of life imprisonment without parole applied. 18 Pa.C.S. § 1102 (mandatory sentence of life imprisonment for second-degree homicide); 61 Pa.C.S. § 6137(a) (inmates "condemned to death or serving life imprisonment" are ineligible for parole).

We fail to see how the trial court violated the Sentencing Code or its fundamental norms by imposing the mandatory sentence. Finally, we recognize Appellant's argument that the trial court imposed longer sentences at his non-homicide counts, *.e.g.* robbery, than was imposed for his co-defendant. Appellant fails to mention, however, that his prior record score is higher than Henderson's. Moreover, Appellant's sentences were imposed concurrently to his mandatory life sentence.

Judgment of sentence affirmed.

Judge Strassburger joins the memorandum.

Judge Nichols concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  10/22/2018